## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| SANDRA MARRIOTT, | ) | |
| | ) | |
| Plaintiff, | ) | CA No. 04-1307 |
| | ) | |
| v. | ) | JUDGE JOY FLOWERS CONTI |
| | ) | |
| AUDIOVOX CORPORATION, | ) | |
| | ) | |
| Defendant. | ) | |

### PLAINTIFF'S BRIEF IN OPPOSITION TO DEFENDANT'S
### MOTION FOR SUMMARY JUDGMENT

### I. COUNTERSTATEMENT OF MATERIAL FACTS

Plaintiff Sandra Marriott commenced her employment with Defendant Audiovox Corporation in 1988 as a retail sales person.   In 1992, she was promoted to regional manager, and assumed responsibility for overseeing three retail sales offices, as well as managing sub-agents of Audiovox.   From 1988 until 2000, Marriott's immediate superior was William Funovits, who was employed by Audiovox as President of its Pittsburgh branch.   In 2000, Audiovox sold its automotive retail operation to Funovits and retained him as general manager of its cellular (or "wireless") operations in Pittsburgh.   About that time, two male retail sales persons, Daniel Brianza and Gary Stepanic, were let go, because the retail business was being phased out in favor of wholesale operations handled through sub-agents.   Because Marriott's duties were different from those of Brianza and Stepanic, and her duties already included

management of sub-agents, whereas theirs did not, she was retained.  At that time, her title was changed to Agent Manager, since that was now her primary duty.  In 2002, Audiovox hired Edward Winklarek, a male, as an additional agent manager.  Funovits was informed by Aris Constantinides, his immediate Audiovox superior, that Winklarek was being hired as an agent manager trainee to assist Marriott in securing new sub-agent accounts.  Other Audiovox employees and Audiovox customers were also informed by Constantinides that Winklarek was being hired as an agent manager to assist Marriott in securing new accounts and that Marriott and Funovits would be training him to perform these duties.  Winklarek's past employment history was confined solely to the management of maintenance and installation operations of cable television companies.  In 2002, Audiovox had absolutely no maintenance or installation operations whatsoever.  In 2000, the decision had been made to operate its cellular division solely as a wholesale operation, selling its products through the sub-agent dealers managed by Marriott and other agent managers.  Winklarek had no experience in sales whatsoever.  Marriott, on the other hand, had received awards for her excellent sales performance from Audiovox on numerous occasions up until 1995 when the practice of giving sales awards was discontinued.

When Winklarek was hired, Funovits was told by Constantinides that Winklarek's duties and compensation were to be identical to those of Marriott.  However, Winklarek's performance was dramatically inferior to that of Marriott in the performance of those duties.  In the twenty month period from May of 2002 to December of 2003, Winklarek was responsible for only 230 cellular activations, whereas Marriott obtained 6,444 activations during the nineteen month period from January of 2002 to July of

2003 , including acquisition of new accounts.   In fact, by the spring of 2003, Funovits was informing upper management in New York that Marriott was "the only glue holding some of the sub-agents" to Audiovox.

Despite her clearly superior sales experience, proven track record, and continued superior performance, Marriott discovered that Winklarek was being paid more than twice as much as herself.  When she complained about this disparity to Constantinides she was told that he would "look into it", but no salary adjustment was ever made despite the fact that Funovits also communicated his concerns about the pay inequity to Constantinides.    Marriott's follow-up calls to Constantinides went unanswered, as did her letter of complaint to Phillip Christopher, president of Audiovox's wireless division.

In February of 2003, Funovits decided to retire from the management of the cellular business in Pittsburgh.  In April of that year, he learned that Constantinides and other New York management had decided to promote Winklarek to his position as general manager.  He sent a very strongly worded letter of protest to Constantinides regarding this decision, pointing out that Winklarek had absolutely no experience in sales or the cellular industry, and had failed to perform acceptably, let alone up to Marriott's standards, in the position of agent manager.

Nevertheless, Audiovox promoted Winklarek to the general manager position. Marriott first learned of this promotion when one of the secretaries informed her that new business cards had been ordered, indicating the new position as general manager. Prior to that time, Winklarek's business cards had reflected the title of agent manager, as did Marriott's, since the two were in the same position.  When she learned of the

3

promotion, Marriott registered a complaint of discrimination with Audiovox's Human Resources Department. Less then two months after her complaint of discrimination, Marriott was terminated. The reason given by Defendant for her termination was a decline in business. This proffered rational, however, is belied by the fact that the only business Audiovox had in the Pittsburgh market was through the sub-agents, of whom Marriott managed 98 while Winklarek managed only three, all owned by him and/or his relatives. As Funovits had previously pointed out to the New York management, if they wished to hold onto their current business and have any hope of additional activation, the only way to accomplish that end was to retain Marriott, at least in her position as agent manager.

Moreover, after Winklarek was hired, Audiovox decided to get back into retail sales, and once again open retail stores. Winklarek had no experience in the management of retail sales outlets or direct cellular sales, whereas Marriott had previously managed three retail stores for Audiovox while simultaneously maintaining such a high direct sales volume that she was named Retail Sales Person of the Year by Audiovox's executive management. Although Defendant claims that Marriott was terminated due to a decline in sales, after her termination, Adam Reeping, a male with no experience or training in sub-agent management, was promoted to her position as agent manager. For the years 2002 and 2003, combined activations attributable to Marriott totaled 6,444, whereas the combined activations attributable to Reeping totaled only ten. Moreover, in the last nineteen months of her employment, from Janaury of 2002 through July of 2003, Marriott sold 6,444 activations. By stark contrast, during the

twenty month period from Winklarek's hire in May of 2002 through December of 2003, all four of the males retained by Audiovox combined sold only 466 activations.

From at least 2000 until the time of her termination in 2003, Audiovox employed no women in a position comparable to Marriotts. Further, they employed no women in any sales management positions. There were no women employed in executive positions with the exception of a lone female on the board of directors.

## II. STANDARD OF REVIEW

Writing for a unanimous Court, Justice O'Connor recently enunciated the standard of review for granting summary judgment:

> The standard for granting summary judgment "mirrors" the standard for judgment as a matter of law, such that "the inquiry under each is the same". Anderson v. Liberty Lobby, Inc. 477 U.S. 242, 250-251, 106 S.Ct. 2505, 91 L.Ed. 2d 202(1986); see also Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed. 2d 265 (1986). It therefore follows that, in entertaining a motion for judgment as a matter of law, the court should review all of the evidence in the record.

> In doing so, however, the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence. Lytle v. Household Mfg., Inc., 494 U.S. 545, 554-555, 110 S.Ct. 1331, 108 L.Ed. 2d 504 (1990); Liberty Lobby, Inc., supra, at 254, 106 S.Ct. Continental Ore Co. v. Union Carbide & Carbon Corp., 370 U.S. 690, 696 n. 6. 82 S.Ct. 1404, 8 L.Ed. 777 (1962). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." Liberty Lobby, supra at 255, 106 S.Ct. 2505. Thus, although the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe. See Wright & Miller 299. That is, the court should give credence to the evidence favoring the nonmovant as well as that "evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses". Id. at 300.

Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 120 S.Ct. 2097 (2000)

> ...[I]n the context of the summary judgment motion, . . . the court [must consider] whether evidence of inconsistencies and implausibilities in the employer's proffered reasons for discharge reasonably <u>could</u> support an inference that the employer did not act for nondiscriminatory reasons, not whether the evidence <u>necessarily</u> leads to that conclusion that the employer did act for discriminatory reasons.

<u>Chipollini v. Spencer Gifts, Inc.</u> 814 F.2d 893, (3rd Cir. 1987) Cert. den. in 483 U.S. 1052 (1987). [Emphasis in original; citation omitted].

## III. **ARGUMENT**

Under the <u>Reeves</u> standard, it is clear that Defendant's Motion for Summary Judgment must be denied, since Marriott's evidence, <u>all of which is uncontradicted</u>, clearly establishes that she was subjected to gender discrimination and retaliation by Audiovox.  Audiovox offers no evidence in support of its motion that is not impeached by Marriott's evidence and its own admissions.

Since the United States Equal Employment Opportunity Commission has already issued an official Determination on the basis of Marriott's evidence herein rejecting Audiovox's proffered reasons for its treatment of Marriott, it is clear that the evidence could and did, support an inference of discrimination and summary judgment is obviously not possible in light of the holding in <u>Chipollini</u>, <u>supra</u>.

In short, Audiovox asks the Court to grant summary judgment in its favor when the evidence clearly demonstrates that Audiovox underpaid, failed to promote and ultimately discharged a woman who was responsible for 92% of the sales being made in its Pittsburgh branch while overpaying, promoting and retaining males who only made 7% of the sales collectively.

**A.   PLAINTIFF'S EVIDENCE ESTABLISHES A CLAIM AGAINST DEFENDANT AUDIOVOX CORPORATION UNDER THE EQUAL PAY ACT.**

Audiovox misrepresents the "facts" upon which it relies to support its Motion for Summary Judgment as "undisputed". In fact, each and every material "fact" Audiovox seeks to advance is directly contradicted by the evidence of record.

The sole evidentiary underpinning for Audiovox's contention that Marriott cannot meet her burden of proof in her Equal Pay Act claim is an unverified, un-notarized "Affidavit" from Aris Constantinides, which is utterly insufficient to justify summary judgment for two reasons. First of all, statements in the Affidavit purporting to establish that Winklarek was hired as a branch manager in 2002 with the intention of taking over for Funovits in 2003 are directly contradicted by Funovits' testimony that Constantinides told him Winklarek was being hired for exactly the same position (agent manager) as was held at the time by Marriott, and that they would be paid identical compensation.

The statement is further contradicted by the signed statement of Ed Rosenberg and Affidavit of Sharon Ciccone, a customer and employee of Audiovox respectively, both of whom were also told by Constantinides that Winklarek was being hired to assist Marriott in her duties as agent manager and to secure new sub-agent accounts, as Marriott had been doing in the position. Therefore, under the <u>Reeves</u> standard, the court must give credence to testimony of Funovits, Rosenberg and Ciccone and discredit the testimony of Constantinides, with the result that the first element of Marriott's equal pay claim is firmly established. Since it is absolutely undisputed that Winklarek was paid more than twice as much as Marriott for doing the same job, Audiovox can only avoid liability under the Equal Pay Act by proving that some factor other than gender was the basis for the inequality of pay.

7

In an attempt to meet this burden, Audiovox once again relies solely on the Affidavit of Constantinides, which claims that Winklarek was paid more than Marriott because he had different duties and superior management experience. Again, as to the difference in duties, the testimony of Funovits, Rosenberg, and Ciccone establishes that such was not the case, and in fact, the duties of Winklarek and Marriott as Audiovox employees prior to his promotion to general manager were the same. As to the claim that Winklarek's management experience was superior, such averments are not based on any personal knowledge of the affiant Constantinides, but only upon hearsay in the form of a resume which the court is apparently expected to assume was submitted to Audiovox by Winklarek. Unfortunately for Audiovox, the court can make no such assumption, and in fact, because the averments contained in Constantinides' Affidavit relative to Winklarek's management experience are not based on personal knowledge and are hearsay, they must be stricken. See Pellegrino v. McMillen Lumber Products Corp., 16 F. Supp. 2d 574 (W.D. Pa. 1996).

Even if the court could properly consider the hearsay documents in question, it would still be insufficient to justify summary judgment, since they are impeached by Funovits' testimony that he was told that Winklarek had "only a little bit" of management experience of any kind. Moreover, it is undisputed that any management or other experience Winklarek may have had was not related in any way to the cellular telephone sales industry, which was the only business of Audiovox's wireless or Quintex division. Rather, all of Winklarek's experience, at least according to his resume (assuming that indeed it is his) was in the totally unrelated field of cable television. Marriott, on the other hand, at the time of Winklarek's hiring, had 15 years experience in

Audiovox's own wireless Quintex division as a retail sales person, retail sales outlet manager and sales agent manager.  Her performance in this regard was so excellent that she had won several awards, including top retail sales person and top wholesale sales person.  The idea that, as Funovits so eloquently put it, a twelve year veteran should be paid less than a newcomer with no relevant experience whatsoever is simply incomprehensible in any rational business sense.

In the present case, the Defendant's proffered reasons are so riddled with implausibilities and inconsistencies that they necessarily raise a inference that the reason for the inequity in pay was discriminatory.  The United States Equal Employment Opportunity Commission has issued an official determination to this effect.

Defendant attempts to make much of the fact that Marriott believed that nepotism played some part in the pay inequity.  However, Defendant's own principal witness discredits that notion.   Nowhere in Constantinides' Affidavit is nepotism mentioned.  Moreover, it is difficult to see, on the evidence of record, how "nepotism" could have been any factor at all, inasmuch as Winklarek was said to be the brother of a friend of Christophoro and, according to Funovits' testimony, he was told that Christophoro did not make the decision to hire Winklarek.  Rather, that decision was made by Constantinides, who had no relationship to Winklarek, and states in his Affidavit that the reason for hiring Winklarek was his alleged management experience. It is simply nonsensical for Defendant to argue that the court should accept any objectively unfounded speculation in contradiction of Audiovox's own witness testimony. Furthermore, in her exit interview form directed to Phillip Christopher, president of its Audiovox's wireless division, Marriott cited Audiovox's treatment of its female

9

employees as one of her chief sources of dissatisfaction.   She also directed a letter to
Christopher in July of 2002 complaining specifically about the pay inequity attributing it
to "discrimination".

> " . . [I]f a plaintiff produces credible evidence that it is more likely
> than not that 'the employer did not act for its proffered reason, then
> the employer's decision remains unexplained and the inferences
> from the evidence produced by the plaintiff may be sufficient to
> prove the ultimate fact of discriminatory intent.'"   Ezold v. Wolf,
> Block, Schorr & Solis-Cohen, 983 F.2d 509 (3rd Cir. 1993), citing
> Chipollini, Supra.

The reasons proffered by Defendant in the instant case for the inequity in pay
between Marriott and Winklarek are that Winklarek was not hired for the same position
and that Winklarek possessed superior management experience.   Both of these
proffered reasons have been discredited by the testimony of disinterested witnesses
and statements of Defendant's own agents.  Plaintiff has therefore met her burden, and
Defendant is not entitled to summary judgment.

**B.   DEFENDANT IS NOT ENTITLED TO SUMMARY JUDGMENT ON MARRIOTT'S CLAIM FOR FAILURE TO PROMOTE.**

Marriott has established a *prima facie*  case of discrimination in failure to
promote by showing that she is a female, that she was qualified for the job of general
manager of Audiovox's Pittsburgh wireless sales operation, that Audiovox failed to
promote her, and that Audiovox instead promoted Winklarek, even though he had less
experience and his performance prior to the promotion was vastly inferior to that of
Marriott, which raises the inference that the reason for the promotion was
discriminatory.   Defendant argues that, because it has proffered its reasons for

promoting Winklarek, neither the court, nor Marriott, can argue with them. This is simply not so, on the facts presented, or under the applicable law.

Once again, the fatal flaw in Defendant's argument is that it requires the court to give credence to the affidavit of Constantinides, which the court cannot do because the affidavit is contradicted by competent testimony.

Defendant mistakenly asserts that Marriott's "self evaluation that she was better qualified for the . . . general manager position" is the only evidence in Marriott's favor. On the contrary, it is the testimony of Funovits, who supervised both Marriott and Winklarek for virtually the entire course of their mutual employment with Audiovox, as well as Audiovox's own admissions as to the superiority of Marriott's performance. that establish the superiority of Marriott's qualifications. Funovits testified that Winklarek refused to cooperate in the training which Audiovox's New York executives had ordered Funovits to provide. Winklarek failed to appear for scheduled appointments, generated complaints from the agents and dealers with whom he was required to interact, and failed to generate the sub-agent activations which were the life blood of Audiovox's wireless communication division. Marriott, in stark contrast, generated thousands of sub-agent activations and managed to continually add new agents, even in the declining market, while continuing to maintain the loyalty of her existing sub-agents.

Moreover, Constantinides was well aware of Marriott's superior performance and Winklarek's shortcomings, because Funovits informed him, in writing, on several occasions and in very specific detail of Winklarek's shortcomings. Under applicable case law, it is the testimony of Funovits to which the court must give credence, and Funovits' testimony alone establishes the superiority of Marriott's qualifications.

11

Further, Defendant has admitted that in the year prior to termination, including the time of the promotion at issue, Marriott managed all of the sub-agents in the Pittsburgh district with the exception of the sub-agencies opened by Winklarek and his relatives, and the three new Audiovox employees, Reeping, Castleforte and Cover, who were not actually independent sub-agents, but rather retail sales people who generated only a handful of activations. Audiovox has further admitted that Marriott's activations vastly exceeded those of Winklarek, Reeping, Castleforte and Cover combined, namely 6,444 activations by Marriott as compared to 466 for the three males combined during a comparable period..

In fact, it is Audiovox that has offered no evidence whatsoever in support of the proposition that Winklarek's qualifications were superior to those of Marriott, because no such evidence exists except in the self serving Affidavit of Constantinides, which is belied by Audiovox's admissions and the testimony of Funovits, a disinterested witness.

> "Where an employer produces evidence that the Plaintiff was not promoted because of its view that the Plaintiff lacked a particular qualification the employer deemed essential to the position sought, a district court should focus on the qualification the employer found lacking in determining whether non-members of the protected class were treated more favorably." Ezold, Supra, at 983 F.2d 528.

In the present case, Defendant has not cited any qualification that was lacking in Plaintiff on which the court might focus. Instead, Audiovox has offered only the Affidavit of Constantinides to bolster its claim that there was no promotion, that Winklarek occupied the position all along. As is amply demonstrated in the record, and as noted, supra, these claims are discredited by Marriott's competent evidence.

Ironically, Audiovox argues that the court should find that it simply made a bad business decision without regard to Marriott's sex. Again, the fatal flaw in this argument

is that nowhere on the record in this case has Audiovox ever admitted that it made a decision not to promote Marriott at all, let alone that the decision was a bad one. By contrast, Marriott's evidence establishes that Constantinides only decided to promote Winklarek to the general manager position in the spring of 2003 after Funovits announced his intention to retire in May of 2003, that Funovits repeatedly informed him that it was a catastrophic business decision because of the superiority of Marriott's qualifications, but that the promotion of Winklarek went through nevertheless. Moreover, at the time the promotion occurred, Audiovox did not have a single woman in a general manager position anywhere in its international organization. In the face of this evidence, it is simply impossible not to draw the inference of sex discrimination and indeed a wholly independent Federal agency has already so concluded.

C.   **PLAINTIFF'S EVIDENCE PRECLUDES ENTRY OF SUMMARY JUDGMENT ON HER CLAIM OF WRONGFUL TERMINATION.**

After several readings of Audiovox's Brief in Support of its Motion for Summary Judgment, Marriott is unable to discern any argument that Marriott has not presented a *prima facie* case of discrimination. Indeed, it would be impossible to so argue, since Marriott is clearly a member of a protected class, she was undisputedly qualified for the position she occupied (namely agent manager), she was discharged from her employment, and males were treated more favorably than she. Indeed, Audiovox's sole argument for granting summary judgment on this issue appears to be that Audiovox claims Marriott was discharged due to declining sales and everyone agrees that sales were declining. This, however, does not end the inquiry because the entire male sales staff of Audiovox's Pittsburgh branch was retained, even though they were making no

sales to speak of, whereas Marriott was single handedly accounting for 92% of the

sales and new activations which were being made.  Obviously, the court cannot credit

declining business as a gender neutral reason for Marriott's termination when the very

males who were responsible for the decline in business were retained.

> "A *prima facie* case under *McDonnell Douglas* raises an inference
> of discrimination only because we presume these acts, if otherwise
> unexplained, are more likely than not based on the consideration of
> impermissible factors.  [See *Teamsters*, 431 U.S. at 358 n.44, 97
> S.Ct. 1843].  And we are willing to presume this largely because
> **\*353** we know from our experience that more often than not people
> do not act in a totally arbitrary manner, without any underlying
> reasons, especially in a business setting.  Thus, when all legitimate
> reasons for ejecting an applicant have been eliminated as possible
> reasons for the employer's actions, it is more likely than not the
> employer, who we generally assume acts only with some reason,
> based his decision on an impermissible consideration such as
> [sex]."

Pivirotto v. Innovative Systems, Inc., 191 F.3d 344 (3rd Cir. 1999), citing Furnco
Construction Corp. v. Waters, 438 U.S. 567, 98 S.Ct. 2943 (1978)

Audiovox would have the Court believe that, out of concern for declining sales,

they discharged the only employee who was making any.  The EEOC clearly found

Audiovox's representations unworthy of credence, and the Court, under the Reeves and

Chipollini, standard, must do likewise.

D.    **DEFENDANT IS NOT ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFF'S
      HOSTILE WORK ENVIRONMENT CLAIM.**

Defendant mistakenly argues that the only basis Plaintiff has presented for her

hostile environment claim is Audiovox's failure to correct the proven pay disparity

between herself and Winklarek.  To the contrary, although the failure to correct the

proven pay disparity is one element of the hostility Marriott experienced, what appears

most clearly of record is Audiovox's pervasive and regular failure to address any of Marriott's complaints of sex discrimination.

On July 15, 2002, Marriott wrote to Philip Christopher, President of Audiovox's Wireless Communications division, to complain about the disparity in pay, indicating her belief that it was discriminatory.    She received no reply whatsoever to this correspondence.    Additionally, Marriott attempted several times to contact Aris Constantinides, who at that point was the decision maker for the Pittsburgh operation, to complain about the disparity. Again, she received no response.  Constantinides refused to return her phone calls. Finally, Marriott complained to Liz O'Connell, in Audiovox's Human Resources department, about the pay inequity and Audiovox's promotion of Winklarek over herself. Again, she received no response. When Marriott again contacted O'Connell, O'Connell told Marriott that she had spoken to Constantinides and did not see anything discriminatory in Marriott's complaints.

Continued failure to address Marriott's complaints in any timely or reasonable fashion is clearly a violation of Audiovox's duty under Title VII to investigate complaints of discrimination.  Audiovox has offered not a shred of evidence that it conducted any investigation whatsoever into Marriott's claims.    Nor has Audiovox offered any explanation for why it chose to disregard complaints made in Marriott's behalf by Funovits relative to both the pay inequity and Winklarek's promotion over Marriott. Constantinides' refusal to even communicate with Marriott regarding her concerns is clearly hostile and in direct contrast to his treatment of Winklarek, with whom he communicated on a regular basis.    Similar conduct has been held to constitute circumstantial evidence of discrimination.  See, e.g. Reeves, supra, in which testimony

that a manager had treated the plaintiff "in a manner, as you would ... treat... a child when ... your [sic] angry with [him]" was held, *inter alia*, to be indictive of discrimination.

In fact, the only indication on the record relative to Constantinides' attitude toward Marriott is Funovits' statement that, when he complained about the pay inequity to Constantinides, Constantinides told him that "if Sandra wanted more money, she should sell more telephones". Selling telephones activations was the sole business of Audiovox's wireless division, and one can only conclude that Constantinides had a bias in favor of men, since Winklarek, Reeping, Castleforte and Cover were all being paid whether they sold any telephones or not.

These facts, coupled with the utter dearth of any women at the level of general manager or agent manager, the positions at issue herein, is clearly indicative of a corporate atmosphere in which women were not tolerated, let alone treated in the same manner as males.

## E.  DEFENDANT IS NOT ENTITLED TO SUMMARY JUDGMENT ON MARRIOTT'S RETALIATION CLAIM.

Once again, and finally, Defendant bases its argument for summary judgment on nothing but its own representations, ignoring the undisputed evidence of record that clearly supports an inference of retaliation.

Defendant seems to mistakenly believe that the sole basis for the retaliation claim is Marriott's complaint about the inequity in pay which she made Christopher in July of 2002. Audiovox has failed to acknowledge that Marriott continued to complain about the pay inequity to Constantinides. The fact that Constantinides refused to acknowledge or respond to her complaints does not erase them. The EEOC obviously

felt that the series of unaddressed complaints was sufficient to raise an inference of retaliatory failure to promote.

There is additional evidence, however, that is much stronger than that relied upon by the EEOC. It is undisputed that Marriott complained to Audiovox's human resources department in June of 2003 about not only the pay inequity, but also the recent promotion of Winklarek to the general manager position, when she had not even had the opportunity to apply. On July 10, 2003, she was terminated. As set forth at length herein, <u>supra</u>, there is absolutely no uncontradicted evidence in this case to establish that Marriott was terminated for any reason other than retaliatory and/or discriminatory animus.

WHEREFORE, summary judgment must be denied.


## CONCLUSION

Under applicable law, and on the evidence cited in support of this response, Defendant Audiovox's Motion for Summary Judgment must be denied in its entirety.

Respectfully submitted,

Susan E. Mahood, Esquire
Pa. I. D. #50024
1600 Law & Finance Building
429 Fourth Avenue
Pittsburgh, PA  15219
(412) 281-1444

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that a true and correct copy of the foregoing

Plaintiff's Brief in Opposition to Defendant's Motion for Summary Judgment was sent on

this 27th day of October, 2005 by hand delivery, to the following:


Patricia A. Monahan, Esquire
Marshall, Dennehey, Warner, Coleman & Goggin
Suite 2900, 600 Grant Street
Pittsburgh, PA  15219


Susan E. Mahood, Esquire
Counsel for Plaintiff